**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| DATABASEUSA.COM LLC, <br> a Nevada Limited Liability Company <br> with its principal place of business <br> in the State of Nebraska, <br><br> Plaintiff, <br><br> v. <br><br> THE SPAMHAUS PROJECT, a <br> company limited by guarantee and <br> organized under the laws of England, <br> aka THE SPAMHAUS PROJECT LTD, <br><br> Defendant. | CASE NO.: 8:19-cv-423 <br><br><br> **BRIEF IN SUPPORT OF** <br> **PLAINTIFF'S MOTION** <br> **FOR COURT'S DEFAULT** <br> **JUDGMENT** |

COMES NOW Plaintiff Databaseusa.com LLC ("Database") and pursuant to Federal Rule of Civil Procedure 55(b)(2) and NECivR 55.1(c) hereby moves for a Court's Entry of Default in its favor on all claims it has asserted against The Spamhaus Project ("Spamhaus").

**INTRODUCTION**

This case arises from a dispute between Database and Spamhaus related to internet marketing and Internet Service Providers ("ISPs"). Spamhaus, a non-profit limited liability company based in the United Kingdom, has placed Database, a Nevada limited liability company with its principle place of business in Douglas County, Nebraska, on a "Domain Block List" ("DBL"), which Spamhaus maintains. The DBL purports to block users from receiving emails or communications from those companies placed on the DBL.

Database now moves this Court for an entry of default judgment in the amount of $18,000,000 and an injunction requiring Spamhaus to remove Database from the DBL and/or any other blacklist maintained by Spamhaus.

1

## STATEMENT OF FACTS

1. Database is a business engaged in gathering and providing various information and databases for the purposes of marketing and analytics. Database gathers its information to assist companies with marketing, including email marketing. [Affidavit of Fred Vakili ("Aff. Vakili"), ¶3.]

2. Database is hired by companies that seek to improve their digital marketing and advertisements. [Aff. Vakili, ¶3.]

3. In order to help those companies, Database provides information that assists in marketing directly to consumers. [Aff. Vakili, ¶5.]

4. Database gathers information from various public sources of information, aggregates that data, and then sells it to those companies so they can better market and advertise to consumers. [Aff. Vakili, ¶¶ 3-4.]

5. Thus, Database's business is predicated on its ability to gather and disseminate information through email. [Aff. Vakili, ¶4.]

6. Database does **not** engage in directly emailing or "spamming" individual persons or consumers. [Aff. Vakili, ¶5.]

7. This is because Database often works with large companies seeking to improve their own marketing using information purchased from Database. Once Database sells that information to other companies, Database is no longer in control of what that company does with the information. [Aff. Vakili, ¶7.]

8. Spamhaus maintains various "blocklists" which Spamhaus then provides to various ISPs. ISPs include companies that sell internet access to consumers, such as cable internet providers. [Aff. Vakili, ¶8.]

9. When an ISP utilizes a Spamhaus "blocklist" then that ISP's customers are blocked from receiving emails from companies or individuals Spamhaus has placed on the "blocklist." [Aff. Vakili, ¶9.]

10. One of the lists Spamhaus maintains is the Domain Block List ("DBL"). According to Spamhaus, the DBL is maintained automatically without the input of Spamhaus employees or agents. [Aff. Vakili, ¶11.]

11. Spamhaus claims that the DBL "includes domains which are used in unsolicited bulk email including phishing, fraud, '419,' or sending or hosting malware or viruses, as well as other domains with poor reputation due to many heuristics." Spamhaus does not list these heuristics and does not explain the methodology for deciding which companies or individuals are placed on the DBL. [Aff. Vakili, Ex. A.]

12. Database does not participate in "unsolicited bulk email including phishing, fraud, '419,' or sending or hosting malware or viruses." [Aff. Vakili, ¶14, Aff. Vakili Ex. A.]

13. Nonetheless, Database discovered in or about May of 2017 that Spamhaus had added Databse to one of its blocklists. [Aff. Vakili, ¶13.]

14. Database was briefly removed in November of 2017 but soon added back to the blocklist, where it has remained ever since. [Aff. Vakili, ¶13.]

15. Database has contacted Spamhaus repeatedly regarding its inclusion on the blocklist, Database has followed the procedure Spamhaus requires to be removed from blocklists. [Aff. Vakili, ¶15.]

16. On June 20, 2019 Spamhaus declined to remove Database from its blocklists, stating that "We do not discuss criteria for inclusion in DBL, however it includes many factors. Your domain matches several of those criteria." [Aff. Vakili, ¶17.]

17. Since June 20, 2019, Spamhaus has refused to communicate whatsoever with Database, nor has Spamhaus provided information on the practices that Database undertakes in violation of its "criteria." [Aff. Vakili, ¶¶ 17-20.]

18. Database's inclusion on Spamhaus' blocklists has substantially hindered Database's ability to do business. [Aff. Vakili, ¶20.]

19. Spamhaus's blocklists are utilized by major companies and platforms in the United States, including Microsoft Outlook and ISPs throughout the country. [Aff. Vakili, ¶21.]

20. As a consequence of being placed on the blocklists, Database has lost numerous clients and opportunities. [Aff. Vakili, ¶¶22, 37-44.]

21. Database has also lost the ability to so much as email its own clients, as platforms such as Microsoft Outlook automatically incorporate Spamhaus's blocklists into spam filters. Practically, this means that many emails from Database personnel to Database clients go directly into junk or spam folders, never to be seen by their intended recipients. [Aff. Vakili, ¶22.]

22. In addition, many corporations refer to the blocklists prior to hiring or engaging with a company. Database's placement on the blocklists has harmed Database's reputation has consequently suffered and many potential clients will not even consider working with Database. [Aff. Vakili, ¶21-23.]

23. Finally, Database has lost many recurring customers. Following its placement on the blocklists, a number of Database's clientele stopped doing business with Database. [Aff. Vakili ¶¶27-49.]

24. Due to Spamhaus' actions, Database's revenue growth has declined significantly year over year. [Aff. Vakili ¶¶27-49.]

25. Since inception in 2011, Database's revenue grew at the following rates:

    a. 2012: 38%

    b. 2013: 25%

    c. 2014: 88%

    d. 2015: 25%

    e. 2016: 25%

    [Aff. Vakili ¶¶28-33.]

26. In 2017, after being put on the blocklist, Database had a significant drop in its revenue growth rate, down to only 9%. [Aff. Vakili ¶36.]

27. The blocklist also impacted Database's ability to retain current customers. [Aff. Vakili ¶37.]

28. In 2018, Database had a revenue growth rate of only 4%. [Aff. Vakili ¶ 39.]

29. Database's drop in revenue is in stark contrast to the other companies in the similar field. Database is one of only three companies in the United State that deals in original compiling of comprehensive databases. [Aff. Vakili ¶42.]

30. The two competing business have estimated annual revenues of $1.8 billion and $550 million, respectively. [Aff. Vakili ¶42.]

31. In addition to the damage to its reputation and revenue, Database has also been blocked or had their ability to do business on important platforms diminished by Spamhaus' actions. [Aff. Vakili ¶¶43-44, 49-50.]

32. Because of the blocklists, Database has been banned from the LinkedIn platform, the standard-bearer of all online business networking platforms. [Aff. Vakili ¶21.]

5

33. Database has also been diminished on major search engines, such as Google and Bing, who now place Database's paid advertising in less favorable positions than Database's competitors as a result of the blocklists. [Aff. Vakili ¶21.]

34. Being unable to do business with LinkedIn, Google, and Bing has severely hampered Database's ability to compete in the marketplace, a direct result of Spamhaus' actions. [Aff. Vakili ¶21.]

35. In addition, because Spamhaus will not communicate with Database and refuses to disclose what Database did to be placed on the blocklists, Database is left without a way to fix its practices in a manner that would conform with Spamhaus' requirements. [Aff. Vakili ¶¶19-23.]

36. If Database is not removed from Spamhaus' blocklists its business will continue to suffer and Database will eventually be forced to cease operations. [Aff. Vakili ¶¶26-43-50.]

37. Database has been damaged by not less than $18,000,000.00 as a direct and proximate result of Spamhaus' actions. [Aff. Vakili ¶48.]

38. Going forward, the remedy at law will be inadequate to properly and fully assess the damages Database continues to suffer. [Aff. Vakili ¶50.]

39. Database requires an injunction against Spamhaus including Database on the blocklists, otherwise the continued damage to Database will be irreparable. [Aff. Vakili ¶¶50-51.]

**ARGUMENT**

**I.  VENUE IS PROPER IN THIS COURT.**

Database has its' headquarters located in Omaha, Nebraska. While Spamhaus is an international company with offices in the United Kingdom and Switzerland, Spamhaus is engaging in continuous and direct activity that is knowingly causing substantial impact on businesses in the

United States, specifically, business in Nebraska. "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125, 134 S. Ct. 746, 753, 187 L. Ed. 2d 624 (2014). "Nebraska's long-arm statute is to be interpreted broadly in view of the rationale and philosophy underlying its adoption. [Neb. Rev. Stat. §] 25–536 expressly extends Nebraska's jurisdiction over nonresidents having any contact with or maintaining any relation with Nebraska as far as the U.S. Constitution permits." *Quality Pork Int'l v. Rupari Food Servs., Inc.*, 267 Neb. 474, 480, 675 N.W.2d 642, 648–49 (2004).

With regards to general jurisdiction, "a court may assert jurisdiction over a foreign corporation 'to hear any and all claims against [it]' only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.' *Daimler AG v. Bauman*, 571 U.S. 117, 122, 134 S. Ct. 746, 751, 187 L. Ed. 2d 624 (2014); citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011).

However, since International Shoe, "specific jurisdiction has become the centerpiece of modern jurisdiction theory." *Daimler*, 571 U.S., 134 S. Ct., 749, 187 L. Ed. 2d 624. See *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 318, 66 S. Ct. 154, 159, 90 L. Ed. 95 (1945) ("the commission of some single or occasional acts of the corporate agent in a state" may sometimes be enough to subject the corporation to jurisdiction in that State's tribunals with respect to suits relating to that in-state activity.) In *International Show*, the Supreme Court found that:

> [A]lthough the commission of some single or occasional acts of the corporate agent in a state sufficient to impose an obligation or liability on the corporation has not been thought to confer upon the state authority to enforce it…other such acts, because of their nature and quality and the circumstances of their commission, may be deemed sufficient to render the corporation liable to suit.

*Id*. at 318, 66 S. Ct. 154, 159, 90 L. Ed. 95. The Court continued, stating:

> But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

*Id.*, at 319, 66 S. Ct., 160, 90 L. Ed. 95.

In the current case, Spamhaus is knowingly engaging in activity which is having a direct and immediate impact on companies operating in Nebraska. Spamhaus is selling its' services to Internet Service Providers ("IPS") who are operating and doing business in Nebraska. Spamhaus is knowingly and willfully acting inside of the State of Nebraska, therefore, it is subject to Nebraska's laws and its courts.

## II. DATABASE HAS ALLEGED A LEGITIMATE CAUSE OF ACTION

Now, "it is nearly axiomatic that when a default judgment is entered, facts alleged in the complaint may not be later contested." *Marshall v. Baggett*, 616 F.3d 849, 852 (8th Cir. 2010). This is because "a judgment by default is as conclusive an adjudication of the issues for purposes of res judicata as a judgment rendered after a trial on the merits." *Brown v. Kenron Aluminum & Glass Corp.*, 477 F.2d 526, 531 (8th Cir. 1973). However, "it remains for the [district] court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." *Marshall, supra. quoting Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010).

Database has clearly alleged a legitimate cause of action. Database brought suit seeking injunctive relief for Tortious Interference and Defamation Per Se, invoking this Court's diversity jurisdiction. [Doc. 1.] Database alleges that Spamhaus has slandered and defamed Database

through the use of the blocklists, tortuously interfering in Database's business relationships and expectancies. Nebraska Courts have long recognized both defamation claims. *See Moats v. Republican Party of Nebraska*, 281 Neb. 411, 421, 796 N.W.2d 584, 593 (2011). Nebraska Courts have similarly recognized tortious interference claims. *See Huff v. Swartz*, 258 Neb. 820, 606 N.W.2d 461 (2000).

### III. DATABASE IS ENTITLED TO DAMAGES IN THE AMOUNT OF $18 MILLION

Once a default is entered "it is still necessary for the Court to determine the plaintiff's damages based upon the evidence." *KM Ag Servs., Inc. v. ASI Ag Servs., Inc.*, No. 8:15-CV-409, 2016 WL 7209672, at 1 (D. Neb. Dec. 12, 2016). Indeed, a plaintiff applying for a default "must still prove its actual damages to a reasonable degree of certainty." *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 819 (8th Cir. 2001).

Database has established to a reasonable degree of certainty the measure of damages it is entitled to. As a direct and proximate result of Spamhaus wrongfully and purposefully placing Database on the blocklist, Database's business has been significantly harmed. As a result of the blocklist, Database has been unable to maintain and service existing customers. Additionally, Database has been unable to expand and grow to new customers. Database had been experiencing steady and continuous growth in revenue each year from inception.

In 2012, Database had revenue of $2,213,000.00, which represented approximately a 38% growth rate. [Aff. Vakili, ¶29.] In 2013, Database had revenue of $2,764,000.00, which represented approximately a 25% growth rate. [Aff. Vakili, ¶30.] In 2014, Database had revenue of $5,217,000.00, which represented a growth rate of approximately an 88% growth rate. [Aff. Vakili, ¶31.] In 2015, Database had revenue of $6,528,000, which represented a growth rate of

9

approximately 25%. [Aff. Vakili, ¶32.] In 2016, Database had a revenue of $8,153,000, which represented a growth rate of approximately 25%. [Aff. Vakili, ¶33.]

Database was wrongfully added to the blocklist in 2017. By placing Database on the blocklist, Spamhaus immediately impacted both Database's ability to retain current customers as well as generate new business. [Aff. Vakili, ¶37.] In 2018, Database had a revenue of $9,279,000, which represented a growth rate of approximately 4%. [Aff. Vakili, ¶39.] Database's decline in revenue is in stark contrast to other companies in the similar field.

There has been a significant and systematic decline in both Database's ability to generate new customers and new business, as well as Database's ability to retain current and existing customers. The blocklist provides a stigma that Database is doing something wrong or illegal, which is completely false. [Aff. Vakili, ¶43.] By projected a continuation of the 2015 and 2016 growth rates of revenue, Database calculated with a reasonable degree of certainty that Database has lost out on approximately $6,000,000.00 in revenue, resulting in a diminution of value of $18,000,000.00. [Aff. Vakili, ¶¶45-48.]

## IV. DATABASE IS ENTITLED TO A PERMANENT INJUNCTION

A plaintiff that seeks "a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57, 130 S. Ct. 2743, 2756, 177 L. Ed. 2d 461 (2010); *see also Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church,* 634 F.3d 1005, 1013 (8th Cir. 2011). While

Database seeks monetary damages, it also seeks a permanent injunction requiring Spamhaus to remove Database from the blocklists. This injunction is necessary so that Database can continue operating its business without tortious interference from Spamhaus.

### a. Database Will Suffer Irreparable Harm

The Eighth Circuit has recognized that "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002), *citing General Mills, Inc. v. Kellogg Co*., 824 F.2d 622, 625 (8th Cir.1987). This Court has repeatedly granted injunctions to prevent damage to reputation or goodwill in the past. *See WWP, Inc. v. Wounded Warriors, Inc*., 566 F. Supp. 2d 970, 978 (D. Neb. 2008) (granting preliminary injunction because "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury"); *W. Plains, L.L.C. v. Retzlaff Grain Co. Inc*., 927 F. Supp. 2d 776, 786 (D. Neb. 2013) (same); *Kuper Indus., LLC v. Reid*, 89 F. Supp. 3d 1005, 1013 (D. Neb. 2015) (granting temporary injunction because "a service mark represents intangible assets such as reputation and goodwill, irreparable harm can be presumed if the plaintiff has shown a likelihood of consumer confusion").

Indeed, Courts often view loss of reputation or goodwill as an irreparable harm because "[a] company's loss of goodwill and reputation among its customers is often not quantifiable, and can therefore amount to irreparable harm." *NL Enterprises, LLC v. United Pac. Pet, LLC*, No. 4:15CV3163, 2016 WL 2688930, at 2 (D. Neb. May 9, 2016) (citations omitted*). See also Iowa Utilities Bd. v. F.C.C*., 109 F.3d 418, 426 (8th Cir. 1996) ("potential loss of consumer goodwill qualifies as irreparable harm"); *Colorado Sec. Consultants, LLC v. Signal 88 Franchise Grp., Inc*., No. 8:16-CV-439, 2017 WL 1047260, at *3 (D. Neb. Mar. 17, 2017) *citing Aria Diagnostics, Inc. v. Sequenom, Inc*., 726 F.3d 1296, 1304 (Fed. Cir. 2013) ("[f]actors such as price erosion, loss of

goodwill, damage to reputation, and loss of business opportunities may all be valid grounds for finding irreparable harm. And money damages may not provide complete relief where harm caused by a breach, even though economic in nature, is impossible to measure accurately."); *Kistco Co. v. Patriot Crane & Rigging, LLC,* No. 8:19-CV-482, 2019 WL 6037416, at *4 (D. Neb. Nov. 14, 2019) (granting preliminary injunction where there was "likelihood of irreparable harm due to further loss of customers, business, and goodwill if Defendants are not enjoined from soliciting additional customers").

The uncontested evidence in this case shows that Database will suffer irreparable harm. Spamhaus's actions pose an ongoing threat to Database's business and Database faces severe revenue declines. [Aff. Vakili. ¶21.]  Without redress, Spamhaus' conduct will eventually result in the complete failure of Database's business. [Aff. Vakill ¶27.]

  **b.  Database's Remedies at Law are Inadequate**

As discussed above, Database faces the certain failure of its business in the future of Spamhaus is not enjoined from continuing to blacklist Database.  For similar reasons, Database's remedies at law are simply inadequate.

Indeed, the Eighth Circuit has noted that "[h]arm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars."  *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003).  This Court has agreed, noting that even where a plaintiff seeks damages, the remedy at law may be inadequate where it is "difficult, if not impossible, to ascertain with any degree of certainty."  *Thrivent Fin. for Lutherans v. Hutchinson*, 906 F. Supp. 2d 897, 907 (D. Neb. 2012).  This Court dealt with another similar issue in *Streck, Inc. v. Research & Diagnostic Sy., Inc.* No. 8:06CV458, 2010 WL 11530582 (D. Neb. Sept. 30, 2010), *aff'd*, 665 F.3d 1269 (Fed. Cir. 2012).  There, the Court noted that "[a]lthough the jury verdict may adequately

12

compensate [the Plaintiff] for its past injuries, the threat of continuing infringement exists." *Id.* The Court noted that "[l]oss of brand name recognition and customer goodwill are the types of injuries that are often incalculable and irreparable" and that damages to goodwill and loss associated with damage to a brand "is difficult to quantify." *Id.* As a consequence this Court found that legal remedies were inadequate and granted a permanent injunction. *Id.*

Thus, even the award of monetary damages, assuming they are collectible against a foreign non-profit company, would not compensate Database for the damage to its future business. Database's remedies at law in this case are simply inadequate and the Court should grant an injunction.

### c. The Balance of Hardships Favors Database and No Public Harm Would Result from an Injunction

The balance of hardships between Database and Spamhaus also favors Database. Database faces the potential destruction of its entire business. Spamhaus will be forced to simply remove Database from its blocklists, a feat that might be accomplished without court involvement if Spamhaus simply responded to Database or explained its criteria for inclusion on blocklists. Database clearly faces the higher hardship.

Finally, an injunction would clearly not harm the public good. This is not a case involving public or governmental action. Rather, this is a matter of a foreign entity interfering with a U.S. business located in Nebraska. Indeed "the public interest is served by preventing consumer confusion in the marketplace." *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001). No public harm would result from a granting of injunctive relief.

## CONCLUSION

Database has asserted valid and proper claims against The Spamhaus Project. Spamhaus was served and given an opportunity to respond to the allegations in the Complaint. Spamhaus elected not to respond and to ignore its' responsibilities to this Court. Database has presented clear evidences showing: (1) to date, the blocklist has damaged Database in an amount of $18,000,000.00; and (2) that going forward, the remedy at law is inadequate to determine the full extent of Databases' damages. As such, Database is entitled to a permanent injunction against Spamhaus including Database on any blocklist.

DATED this 27th day of December, 2019.

> DATABASEUSA.COM LLC,
> Plaintiff
>
> BY: */s/ Robert S. Sherrets*
> Robert S. Sherrets, NE #24791
> James L. Schneider, NE #25825
> Sherrets Bruno & Vogt LLC
> 260 Regency Parkway Drive, Suite 200
> Omaha, NE 68114
> Telephone: (402) 390-1112
> Facsimile: (402) 390-1163
> law@sherrets.com
> ATTORNEYS FOR THE PLAINTIFF