## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DATABASEUSA.COM LLC, <br> a Nevada Limited Liability Company <br> with its principal place of business <br> in the State of Nebraska, <br> <br> Plaintiff, <br> <br> v. <br> <br> THE SPAMHAUS PROJECT, a <br> company limited by guarantee and <br> organized under the laws of England, <br> aka THE SPAMHAUS PROJECT LTD, <br> <br> Defendant. | CASE NO.:  8:19-cv-423 <br> <br> **PLAINTIFF'S POST EVIDENTIARY HEARING BRIEF RE: SERVICE OF PROCESS, DAMAGES, and JURISDICTION** |

COMES NOW Plaintiff Databaseusa.com LLC ("Database") and submits the following post evidentiary hearing briefing following the Court's entry of a Default Judgment.

## INTRODUCTION

This lawsuit is a result of a UK business, The Spamhaus Project ("Spamhaus"), actively interfering with a company doing business in the State of Nebraska, Database. Database has filed suit asking for both monetary damages as well as a permanent injunction against Spamhaus, ordering Spamhaus to remove Database from its' blocklists or engaging in any other activity which harms Database's ability to communicate or conduct business. This Court has granted Database's motion for default judgment. [Doc. 16.] This Court then held an evidentiary hearing on March 12, 2020, which was continued until March 13, 2020. [Doc. 24.] Defendant Spamhaus failed to appear at either hearing.  This Court granted Database additional time to submit briefing on the issues of service, jurisdiction, and damages.  [Doc. 24.]

1

**ARGUMENT**

**I.   DATABASE PROPERLY SERVED SPAMHAUS.**

Database served an authorized representative of Spamhaus by using a process server. After a review of the Federal Rules of Civil Procedure, the Hague Convention, and the Civil Procedure Rules in the United Kingdom, it is clear that Database affected proper service of process when a process server left the service with an authorized representative of Spamhaus.

**A.   Standard.**

"The general attitude of the federal courts is that the provision of Federal Rule 4 should be liberally construed in the interest of doing substantial justice...." *Estate of White v. Hartford Life & Acc. Ins. Co.*, No. 4:07-CV-00145, 2007 WL 7217079 at 2 (S.D. Tex. Oct. 11, 2007) *citing* 3 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1082. The Federal Rules of Civil Procedure govern service of process methods for foreign corporations.  See F. R. Civ. P. 4(h). Specifically, a foreign corporation "must be served: (2) at a place not within any judicial district of the United States, in a manner prescribed by Rule 4(f) for serving any individual…" Under Rule 4(f) foreign service of process may be completed "by any internationally agreed means of service that is **reasonably calculated to give notice**, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." F. R. Civ. P. 4(f)(1) (emphasis added).

**B.   The Hague Convention.**

The United Kingdom is a signatory of the Hague Convention. See *Baskett v. Autonomous Research LLP*, No. 17-CV-9237 (VSB), 2018 WL 4757962 at 12 (S.D.N.Y. Sept. 28, 2018). The Hague Convention provides the standard rules for international service of process among countries who have expressly agreed to its terms.  Any country which is a member of the Hague Convention

but objects to certain Articles may create a list of Declarations, listing the country's qualifications with respect to the Articles. Countries may agree to, oppose, or qualify Article 10, the section governing service of process by private process servers.

Article 10 of the Hague Convention provides:

Provided the State of destination does not object, the present Convention shall not interfere with –

a) the freedom to send judicial documents, by postal channels, directly to persons abroad,
b) **the freedom of** judicial officers, officials **or other competent persons of the State of origin to effect service of judicial documents directly** through the judicial officers, officials **or other competent persons of the State of destination**,
c) **the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through** the judicial officers, officials or **other competent persons of the State of destination.**

(emphasis added).

### C. The UK Authorizes Service Through a Process Server.

The United Kingdom accepts service of process via a private process server. The United Kingdom declares "No opposition" to Article 10(a), and "Additional Information" for Articles 10(b) and (c). In its "Text of the declarations," the additional information lists:

(d) With reference to the provisions of paragraphs (b) and (c) of Article 10 of the Convention, documents for service through official channels will be accepted in the United Kingdom only by the central or additional authorities and only from judicial, consular or diplomatic officers of other Contracting States.*
…
*Extract from a letter dated 11 September 1980 addressed by the Foreign and Commonwealth Office to the Permanent Bureau:
"(...)Thank you for your letter of 31 July in which you ask for assistance in the interpretation of the declaration made by the United Kingdom on 17 November 1967 in relation to Article 10(c) of the Convention.
I am happy to confirm that **our declaration does not preclude any person in another Contracting State who is interested in a judicial proceeding (including his lawyer) from effecting service in the United Kingdom "directly" through a competent person** other than a judicial officer or official, e.g., a solicitor. (...)"

3

(emphasis added).

US Courts have similarly found that a process server has been considered a "competent person" that may render service within the United Kingdom. *Brown-Thomas v. Hynie*, 367 F. Supp. 3d 452, 464 (D.S.C. 2019); *See also Selmani v. Kline*, Civ. No. 2:16-cv-00264 (WJM), 2016 WL 5339574, at 2 (D.N.J. Sept. 22, 2016) (holding that, pursuant to the Hague Convention, a party may use a process server to effectuate process within the United Kingdom); *Health Sci. Distribs., Co.*, 2012 WL 601148, at 3 (determining that the use of a process server "is permissible in the United Kingdom); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 240 F.R.D. at 609–10 (holding that the United Kingdom did not object to the use of process servers, and the use of a process server was valid in Bermuda).

### D. Database Complied with the Hague Convention and Achieved Proper Service on Spamhaus.

Database elected Article 10 service upon Spamhaus' London office via a process server. After researching the Hague Convention's requirements and the United Kingdom's Declarations, Database researched and contacted several competent process servers located in the United Kingdom. Database hired United Kingdom Process ("UK Process"), which is located at 31 – 35 Kirby Street, London. [Doc. 6 at 2.] Philip Smith of UK Service is a process server in the UK who completed the service of process. [Doc. 6 at 2.]

### E. The Service Completed by the Process Server was Proper.

Since the UK authorizes service by a process server to a business to complete service, the next question is whether the service obtained by Database was sufficient. In the UK, personal service is a recognized means of service. See Rule 6.3(1)(a) of the Civil Procedure rules of the United Kingdom. Service on a company may be completed by personal service "by leaving it with

a person holding a senior position within the company or corporation." Rule 6.5(3)(b). A person holding a "senior position" is defined as "a director, treasurer, secretary chief executive, manager or other officer of the company." U.K. C.P.R. & Service Practice Direction 6.2(1); *C&sm Int'l v. Prettylittlething.com Ltd.*, No. CV 19-4046-CBM-KSX, 2019 WL 7882077, at 2 (C.D. Cal. Oct. 8, 2019). In *C&sm Int'l*, the Court found that there was insufficient service of process because the process server left the service with a security guard. *Id.*, at 1.

In the current case, Database hired UK Process to complete service upon Spamhaus at its known address of 26 York Street, London, UK W1U 6PZ. [Doc. 6 at 2.] Philip Smith, acting as an agent of UK Process, completed service upon Mr. Charlie Benn, who accepted service on behalf of Spamhaus, on October 18, 2019. [Doc. 6.] Charlie Benn is "authorized to accept service of [the Complaint] in the absence of any Director or Company Secretary of the Spamhaus Project being present or found there." [Doc. 6 at 3.]

Database has fully complied with the Federal Rules of Civil Procedure, the Hague Convention, the United Kingdom's Declarations on Article 10, and the Civil Procedure Rules of the United Kingdom. Service may be completed in the United Kingdom with a process server completing service of process on an authorized representative. By retaining UK Process to serve Charlie Benn, an authorized representative of Spamhaus, Database has complied with the requirements of the Federal Rules of Civil Procedure, the Hague Convention, and the United Kingdom Rules of Civil Procedure.

## II. THIS COURT HAS JURISDICTION OVER SPAMHAUS.

This Court also has jurisdiction over Spamhaus. With regards to general jurisdiction, "a court may assert jurisdiction over a foreign corporation 'to hear any and all claims against [it]' only when the corporation's affiliations with the State in which suit is brought are so constant and

pervasive 'as to render [it] essentially at home in the forum State.' *Daimler AG v. Bauman*, 571 U.S. 117, 122, 134 S. Ct. 746, 751, 187 L. Ed. 2d 624 (2014); citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011). "A defendant domiciled in a forum state or who has activities that are "substantial" or "continuous and systematic" is subject to the general jurisdiction of that state." *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 833 (N.D. Ill. 2000).

With regards to specific jurisdiction, "the commission of some single or occasional acts of the corporate agent in a state" may sometimes be enough to subject the corporation to jurisdiction in that State's tribunals with respect to suits relating to that in-state activity. See *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 318, 66 S. Ct. 154, 159, 90 L. Ed. 95 (1945). Courts have applied a three-part test to determine if a district court may exercise specific jurisdiction:

> (1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable.

*Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998), holding modified by *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006).

"As technological progress has increased the flow of commerce between States, the need for jurisdiction over nonresidents has undergone a similar increase." *Hanson v. Denckla*, 357 U.S. 235, 250–51, 78 S. Ct. 1228, 1238, 2 L. Ed. 2d 1283 (1958). In *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, the District Court stated that "maintaining an interactive website that sends out information regarding the defendant's upcoming services and solicits names for mailing lists

6

constitutes advertisement and solicitation, thus meeting the 'use in commerce' test under the Lanham Act." 96 F. Supp. 2d 824, 832 (N.D. Ill. 2000). "The intended market for business conducted through a website can be determined by considering the apparent focus of the website as a whole." *Graduate Mgmt. Admission Council v. Raju*, 241 F. Supp. 2d 589, 598 (E.D. Va. 2003). The "Court must determine whether the website is designed to attract or serve a United States audience." *RE/MAX, LLC v. Shenzhen Remax Co., Ltd*, No. 115CV02496REBSKC, 2019 WL 1081039, at 5 (D. Colo. Jan. 18, 2019), report and recommendation adopted, No. 15-CV-02496-REB-SKC, 2019 WL 1437620 (D. Colo. Feb. 27, 2019).

In *Euromarket Design*, the Court engaged in analysis to determine "what level of interaction with an Internet website is required to rise to the level of 'minimum contacts' such that a defendant maintaining that website has purposefully availed itself of the laws of the forum state, making specific personal jurisdiction over it appropriate." *Id*., 837. The Court analyzed three categories of internet websites: (1) conducting business over the internet; (2) interactive websites; and (3) passive websites. *Id.* Spamhaus would likely qualify under the first two categories.

The first category consists of "situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction over the Internet, personal jurisdiction is proper." *Id.*, 837. In *CompuServe, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir.1996), the defendant was a Texas resident who entered into a contract to distribute software through CompuServe's Internet server located in Ohio. The defendant's software was uploaded via the Internet to the server located in Ohio and downloaded and used by an Ohio resident who had contracted with the defendant to use the software. The Court found personal jurisdiction, holding that the defendant had purposefully directed his business activities towards

7

Ohio by entering into a contract with an Ohio resident and transmitting files via the Internet to Ohio.

Spamhaus qualifies as a doing business over the internet. Spamhaus provides information to ISP's in the United States, including Nebraska. Spamhaus does have a free public service, but that service "is restricted to low-volume non-commercial users only." [Doc. 14-1 at 11.] Indeed, Spamhaus lists are utilized by major commercial entities as well, including platforms in the United States such as Microsoft Outlook and ISPs throughout the country. [Doc. 14-1 at ¶ 21.] Whether acquired for free or commercially, Spamhaus information is used on servers throughout the United States and impacts businesses in Nebraska.

The second category involves interactive websites where a user can exchange information with the host computer. "In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). In *Maritz, Inc. v. Cybergold, Inc.*, 947 F.Supp. 1328, the court found personal jurisdiction over a defendant who had established a website as a promotion for its upcoming Internet service. Users of the website were encourage to add their addresses to a mailing list for future promotions and information. The court found that the defendant's conduct and the level of interactivity of the website was "clearly intended as a promotion ... and solicitation ... suggest[ing] that the defendant is purposefully availing itself of the privilege of conducting activities in [the forum state.]" *Id*. at 1333. Spamhaus would also meet this definition, as they offer curated blocklists to users, encourage users to use their block lists, and solicit commercial business.

The third is a passive website. "A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise personal

jurisdiction." *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). Spamhaus is clearly not a passive website. Spamhaus is not merely providing information, such as Wikipedia or some other electronic encyclopedia. Spamhaus is knowingly cultivating and providing information to ISP's, both commercially and non-commercially, in the United States which has the direct result of harming businesses in the United States.

As Vakili testified, Spamhaus placed Database on the blocklist, removed them temporarily, then returned Database to the blocklist and merely stated that they "did not like [Database's] business." Spamhaus is deliberately attacking, and destroying, businesses in the United States. In the current case, Spamhaus is knowingly engaging in activity which is having a direct and immediate impact on companies operating in Nebraska. Spamhaus is selling its' services to Internet Service Providers ("IPS") who are operating and doing business in Nebraska.

Spamhaus is willfully acting inside the State of Nebraska and is therefore subject to Nebraska's laws and the jurisdiction of Nebraska courts.

### III. DATABASE IS ENTITLED TO MONETARY DAMAGES.

This Court has received evidence in both the form of the affidavit of Fred Vakili and Mr. Vakili's live testimony. It is clear that Spamhaus' role as judge, jury, and executioner against Database's ability to conduct business has had catastrophic results. Fred Vakili testified to his knowledge, training, and experience in buying and selling businesses. Vakili testified about the extreme difficulty Database has had in obtaining new clients, retaining current clients, and maintaining relationships with Fortune 500 customers as a result of Spamhaus' actions.

The evidence shows that in 2012, Database had revenue of $2,213,000.00, which represented approximately a 38% growth rate. [Doc. 14-1 at 5, ¶29.] In 2013, Database had revenue of $2,764,000.00, which represented approximately a 25% growth rate. [Doc. 14-1 at 5,

¶30.] In 2014, Database had revenue of $5,217,000.00, which represented a growth rate of approximately an 88% growth rate. [Doc. 14-1 at 5, ¶31.] In 2015, Database had revenue of $6,528,000, which represented a growth rate of approximately 25%. [Doc. 14-1 at 5, ¶32.] In 2016, Database had a revenue of $8,153,000, which represented a growth rate of approximately 25%. [Doc. 14-1 at 6, ¶33.]

Database was wrongfully added to the blocklist in 2017. By placing Database on the blocklist, Spamhaus immediately impacted both Database's ability to retain current customers as well as generate new business. [Doc. 14-1 at 6, ¶37.] In 2018, Database had a revenue of $9,279,000, which represented a growth rate of approximately 4%. [Doc. 14-1 at 6, ¶39.] Database's decline in revenue is in stark contrast to other companies in the similar field. [Doc. 14-1 at 6, ¶42.] Vakili testified at the March 13, 2020 hearing that Database had no growth at all in 2019.

Vakili also testified that based on his experience growing a similar business Database's growth rate would have remained at 25% or greater for 2017 through 2019. Based on this projection, in 2017, Database should have experienced $10,191,250 in revenue, which is calculated by multiplying a 25% increase over the actual revenue from 2016.

\*\*\*

**2017 Projected Revenue** = $8,153,000 x 1.25 = **$10,191,250**

2017 Projected Revenue = 2016 Projected Revenue x 25% increase

\*\*\*

Continuing this extrapolation, in 2018, Database would have experienced an additional 25% grown, with revenue equaling $12,739,062.50, which is calculated by multiplying a 25% increase over the projected revenue from 2017.

10

\*\*\*

**2018 Projected Revenue** = $10,191,250 x 1.25 = **$12,739,062.50**

2018 Projected Revenue = 2017 Projected Revenue x 25% increase

\*\*\*

Similarly, in 2019, Database would have realized $15,923,828.13 in revenue, which is calculated by multiplying a 25% increase over the projected revenue from 2018.

\*\*\*

**2019 Projected Revenue** = 2018 Projected Revenue: $12,739,062.50 x 1.25 = **$15,923,828.13**

2019 Projected Revenue = 2018 Projected Revenue x 25% increase

\*\*\*

This calculation shows a loss in revenue for 2019 at approximately $6,600,000, which is calculated by taking the 2019 Projected Revenue and subtracting the 2019 actual revenue.

\*\*\*

$15,923,828.13 - $9,279,000 = $6,644,828.13

2019 Projected Revenue – 2019 Actual Revenue = Lost Revenue

\*\*\*

Vakili testified that a three times (3 x) multiplier on revenue is appropriate given the nature of the business to calculate Database's loss in value, basing this on his decades of experience in the database maintenance industry. Rounding down to $6,000,000.00, a 3x multiplier calculates a diminution in Database's value at $18,000,000.00

\*\*\*

$6,000,000 x 3 = **$18,000,000**

\*\*\*

**CONCLUSION**

Database has sufficiently served Spamhaus by hiring a process served based in the United Kingdom to personally serve a representative of Spamhaus, meeting the requirements of the Federal Rules of Civil Procedure, the Hague Convention, and the United Kingdom Rules of Civil Procedure. Due to its actions, which clearly affect commerce and business in Nebraska through the distribution and sale of block lists to both commercial and non-commercial entities, Spamhaus is subject to this Court's jurisdiction. Finally, Database is entitled to money damages due to Spamhaus' direct effect on Database's ability to grow and conduct its business.

This Court should enter an injunction and monetary award against Spamhaus.

DATED this 23rd day of March, 2020.

        DATABASEUSA.COM LLC,
        Plaintiff

BY:   */s/ Robert S. Sherrets*
       Robert S. Sherrets, NE #24791
       James L. Schneider, NE #25825
       Sherrets Bruno & Vogt LLC
       260 Regency Parkway Drive, Suite 200
       Omaha, NE 68114
       Telephone: (402) 390-1112
       Facsimile: (402) 390-1163
       law@sherrets.com
       ATTORNEYS FOR THE PLAINTIFF